IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


VICTOR SALLEE            .                                    PLAINTIFF


            V.                    Civil No. 2:14-cv-02141-MEF


CAROLYN W. COLVIN, Commissioner,
Social Security Administration                               DEFENDANT


### MEMORANDUM OPINION

        Plaintiff, Victor Sallee, brings this action under 42 U.S.C. § 405(g), seeking judicial review

of a decision of the Commissioner of the Social Security Administration (Commissioner) denying

his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under

Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).   In this judicial review, the court must determine whether there is substantial

evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. §

405(g).

**I.**      **Procedural Background:**

        Plaintiff filed his applications for DIB and SSI on February 27, 2012, alleging an onset

date of May 10, 2011, due to quadruple heart bypass, bone spurs in the neck, and back disease.

Tr. 277-284, 309, 318-319, 356-357, 378-379.  The Commissioner denied his application initially

and on reconsideration.  Tr. 221-237.  At the Plaintiff's request, an Administrative Law Judge

("ALJ") held an administrative hearing on December 11, 2012.  Tr. 189-216.  Plaintiff was present and represented by counsel.

At the time of the hearing, Plaintiff was 51 years old and possessed a General Education Diploma.  Tr. 194.  He had past relevant work ("PRW") experience as an auto body repairer and painter.  Tr. 183, 310.

On March 7, 2013, the ALJ concluded that the Plaintiff's disorder of the heart status post surgery, neck pain, back pain, and depression were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  Tr. 175-178.  After partially discrediting the Plaintiff's subjective complaints, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work

> except the claimant is able to perform work where interpersonal contact is
> incidental to the work performed, where the complexity of tasks is learned and
> performed by rote, with few variables and little judgment, and where the
> supervision required is simple, direct, and concrete.

Tr. 178.  The ALJ then found Plaintiff could perform work as a warehouse checker, gasket inspector, and fishing float assembler.  Tr. 183-184, 328-335.

The Appeals Council denied the Plaintiff's request for review on May 29, 2014.  Tr. 1-7. Subsequently, Plaintiff filed this action.  ECF No. 1.  This matter is before the undersigned by consent of the parties.  ECF No. 7. Both parties have filed appeal briefs, and the case is now ready for decision.  ECF Nos. 8, 9.

## II.   Applicable Law:

This court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Teague v.* Astrue, 638 F.3d 611, 614 (8th Cir. 2011).  We must affirm

the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

3

Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    **Medical Evidence**:

The relevant time period in this case is from May 10, 2011, through March 7, 2013.  Tr. 173, 184.  In the months leading up to the relevant time period, the Plaintiff was treated in the emergency room at Mercy Hospital on two occasions for lower back pain.  Tr. 547-560.  Records indicate that the Plaintiff had been remodeling his home and had injured his back while lifting a large roll of carpet.  Doctors prescribed narcotic pain medication and muscle relaxers.

On May 11, 2011, the Plaintiff returned for the treatment of lower back pain caused by lifting furniture.  Tr. 561-567.  He reported that the pain radiated into his buttocks and resulted in weakness in his legs.  Although the doctor offered to take x-rays, the Plaintiff declined further testing, requesting a "few days" of pain medication.  Following the administration of injections of Dilaudid and Phenergan, the Plaintiff improved.  When the doctor discharged him into the care of his friend, the Plaintiff was ambulatory and exhibited a steady gait.  The doctor also noted a normal mood and affect.

On May 13, 2011, the Plaintiff indicated that his pain was a 5 on a 10-point scale after lifting a dresser.  Tr. 568-575.  Weakness radiated into his thighs, and he reported bending, twisting, and certain positions aggravated his pain.  X-rays of his lumbar spine showed straightening of the lumbar spine, which the radiologist opined could be related to muscle spasms, as well as some minimal degenerative endplate changes.  The Plaintiff was prescribed Lorcet Plus, ice, and Ibuprofen to treat chronic lumbar pain and degenerative disk disease of the thoracic spine.

On August 8, 2011, the Plaintiff presented at Freeman Hospital after experiencing chest pain while walking around Wal-Mart.  Tr. 384-399.  He refused admission, opting instead for an outpatient stress test.  However, his pain worsened and he returned on August 11, 2011.  Tr. 400-455, 492-505.  The pain was associated with dyspnea and radiated into his left shoulder and back and down his left arm.  Testing resulted in a diagnosis of coronary artery disease with ischemia for which he underwent triple coronary artery bypass and left internal mammary artery bypass graft to the left anterior descending artery.  Following an unremarkable hospital stay, the doctor discharged him on August 16, 2011.

On September 27, 2011, the Plaintiff sought treatment at Freeman Hospital for back pain associated with bending.  Tr. 456-462.  The emergency room doctor treatment him for lumbar sprain and prescribed Norco, Prednisone, and Flexeril.  The Plaintiff returned the following day with the same complaints.  Tr. 463-471.  This time, the doctor prescribed Norflex and advised him to consult an orthopedist or pain management physician for exacerbation of chronic pain.

On October 8, 2011, doctors at the Freeman Hospital emergency department treated him for chest pain.  Tr. 472-481.  They diagnosed him with a chest contusion resulting from being hit in the chest by another man.

On October 12, 2011, Plaintiff followed-up with Dr. Ryan Longnecker.  Tr. 490-491.  He reported feeling "much better" since his bypass surgery, denying chest pain or shortness of breath.  He voiced being "content" with his current state of health.  Dr. Longnecker advised him to continue taking the Aspirin and prescribed Lisinopril, Lipitor, Vitamin D supplements, smoking cessation, and cardiac rehabilitation.

On November 18, 2011, the Plaintiff presented at the Freeman Urgent Care Center for chronic lower back pain with an onset of three to four days prior.  Tr. 458-484.  He also requested

medication for his anxiety, stating that his father had passed away the previous week. The Plaintiff became angry and cursed at the doctor when he refused to prescribe narcotic pain medication. He received Toradol, Prednisone, and Norflex injections before leaving against medical advice.

On January 18, 2012, the Plaintiff returned to Dr. Longnecker's office. Tr. 485-486. Again, he denied chest pain, shortness of breath, orthopnea, complete paroxysmal nocturnal dyspnea, pre-syncope, or palpitations. Following a normal exam, Dr. Longnecker advised him to continue his current medications, noting a good hemodynamic profile and the absence of cardiac symptoms. He also directed the Plaintiff to establish with a primary care physician.

On March 2, 2012, the Plaintiff returned to Mercy Hospital with complaints of low back pain after lifting something heavy. Tr. 582-587. He requested a pain injection, indicating that he planned to schedule an appointment with Dr. Jones the following week. Interestingly, he rated his pain as a 3 on a 10-point scale, but doctors gave him Nubain and Zofran injections as well as prescriptions for Norco and Robaxin to treat his chronic pain. The Plaintiff responded well to treatment, and was released home ambulatory and "feeling better." Again, doctors advised him to seek out a primary care physician, as the emergency room does not provide pain management.

The Plaintiff returned to Mercy Hospital on March 5, 2012, with complaints of chest pain following a disagreement with his mother. Tr. 506-540. He was admitted to telemetry for overnight observation. Plaintiff reported taking Nitroglycerin with some relief. A coronary angiogram revealed coronary ectasia in the proximal lower anterior descending coronary artery with 50 percent stenosis, ectasia (artherosclerosis) in the diagonal artery with 50 percent stenosis, left circumflex artery with 70 percent stenosis after the first obtuse marginal artery and 90 percent stenosis at the second obtuse marginal artery, phasic competitive flow from the saphenous vein graft, 70 percent stenosis and ectasia proximally in the right coronary artery, and a left ventricular

ejection fraction rate of 50 percent.  The overall impression was "well vascularized" with "no need for intervention."   The doctor discharged the Plaintiff on March 6, 2012, with diagnoses of noncardiac chest pain, potentially related to anxiety; chronic lower back pain; anxiety disorder; and, chemical dependency with nicotine.  Records indicate that the Plaintiff was not "on optimal medical therapy" so the doctor prescribed Aspirin, Hydrocodone, Alprazolam, Atorvastatin, Lisinopril, Nitroglycerin, and Metoprolol.

The Plaintiff returned on March 9, 2012, with complaints of low back pain.  Tr. 541-547.  Following the administration of Dilaudid and Ondanestron injections, doctors released the Plaintiff home.  At that time, he was ambulatory, in stable condition, and feeling better.

On March 20, 2012, Dr. James Wellons completed an RFC assessment.  Tr. 591-598.  After reviewing only the Plaintiff's medical records, he concluded the Plaintiff could perform a full range of light work.  Dr. Bill Payne affirmed this assessment on June 14, 2012.  Tr. 607.

On August 1, 2012, the Administration ordered a mental diagnostic evaluation with Dr. Robert Spray, Jr.  Tr. 608-612.  The Plaintiff admitted to minimal formal mental health treatment in the past with no hospitalizations.  At current, he was taking medication for his anxiety, but could not remember the name of the medication.  Dr. Spray noted the Plaintiff's cooperation, euthymic mood, and normal thoughts.   He diagnosed panic disorder not otherwise specified in partial remission with medication, depression not otherwise specified, and rule out mild vascular dementia.  Dr. Spray assessed a global assessment of functioning score of 55-60.  He also indicated that the Plaintiff had the capacity to communicate and interact in a socially adequate manner, the ability to communicate in an intelligible and effective manner, an adequate capacity to cope with the typical mental/cognitive demands of basic school or work-like tasks, adequate attention and

concentration (although noted to be poor when experiencing depression and/or anxiety), the ability

to persist well, and a normal capacity to complete work-like tasks within an acceptable timeframe.

On August 22, 2012, Dr. Kevin Santulli completed a psychiatric review technique form

and a mental RFC. Tr. 617-634. Reviewing only the Plaintiff's medical records, he concluded the

Plaintiff would have moderate limitations carrying out detailed instructions, maintaining attention

and concentration for extended periods, sustaining an ordinary routine without special supervision,

completing a normal workday or workweek without interruptions from psychologically based

symptoms, accepting instructions and responding appropriately to criticism from supervisors,

responding appropriately to changes in work setting, setting realistic goals, and making plans

independently of others.

The Plaintiff returned to Mercy Hospital on September 10, 2012, for the treatment of left-

sided chest pain. Tr. 635-656. He rated his pain as a 9 on a 10-point scale, indicating that it

radiated to his back and rendered him short of breath. The Plaintiff indicated he had taken three

Nitroglycerin tablets to no avail. However, it was also noted that he had not followed up with a

cardiologist, was taking only a few of his prescribed medications, and continued to smoke. Initial

and serial cardiac enzyme tests were negative, as was a chest x-ray. The cardiologist on call

recommended a stress test, but it showed no reversible ischemia. A physical examination was also

unremarkable, showing no range of motion deficits. Accordingly, the Plaintiff was treated with

Lovanox, Aspirin, Metoprolol, Lisinopril, Nitroglycerine, and Stating. He responded well to

treatment and was released home ambulatory and feeling better.

On September 14, 2012, Plaintiff sought to establish care with Dr. John Williams. Tr, 658-

660. Dr. Williams noted the Plaintiff's recent overnight stay for chest pain and studies for bypass

evaluation showed small but patent grafts. The Plaintiff reported seeking disability for cardiac

problems and being on a number of medications that appeared to be helping.  He was taking both Hydrocodone and Xanax.  Dr. Williams assessed him with chronic diffuse ischemic heart disease; anxiety; and, angina pectoris.  He then prescribed Nortryptyline, Ultracet, and Nitroglycerine.

On October 20, 2012, Plaintiff reportedly fell in a hole and injured his back.  Tr. 657.  He said it felt as though he had broken his tailbone.  His legs were shaky and tingling.  X-ray showed only minimal anterior end-plate spurring at the L4 and L5 levels.  Although the record does not indicate the course of treatment followed, it does show that the Plaintiff responded well to treatment and was released home that same day.

On January 8, 2013, Plaintiff reported to the emergency room at Sparks Medical Center for chest pain, rating his pain as a 7 on a 10-point scale.  Tr. 709-715. However, it appears that he left before being seen, due to the wait time.

On January 9, 2013, Plaintiff presented at Mercy Hospital with continued chest pain.  Tr. 716-722.  Records indicate he had taken Nitroglycerin without relief.  Tr. 716-722.  He also reported being out of his pain medications.  The doctor noted that the Plaintiff's last discharge notation indicated possible dependence on pain medication.  An EKG and chest x-ray were unremarkable.  Further, cardiac enzyme testing was normal, and the doctor did not feel his pain was cardiac in nature.  The doctor opined that the motive for the visit appeared to be the fact that he was out of pain medication.  He also documented discharge following symptomatic relief.

This same day, the Plaintiff presented at the Sparks emergency department for the same complaints.  Tr. 674-708.  Due to his history, doctors admitted him to telemetry for overnight observation and resumed his home medications.  However, repeat cardiac enzymes remained normal, an EKG showed no acute abnormalities, and chest x-rays were normal.  A Lexiscan also revealed no evidence of reversible ischemia.  Doctors ultimately assessed him with unstable

angina, acute myocardial infarction ruled out; coronary artery disease, status post coronary artery bypass graft; hypertension; dyslipidemia; chronic tobacco abuse; and pain medication seeking behavior.[1]  He was strongly advised to quit smoking and follow-up with his primary care physician.

On January 16, 2013, the Plaintiff returned to Sparks with complaints of bilateral lumbar pain.  Tr. 661-673.  X-rays showed normal alignment, normal disk spaces, and no fractures.  An examination revealed an antalgic gait and a decreased range of motion in the lumbar spine.  The Plaintiff also reportedly experienced some chest pain while in the exam room.  However, by the time the doctor examined him, he had already taken Nitroglycerine and reported some relief.  The doctor diagnosed him with lumbar strain and stable angina.

On March 12, 2013, he presented at Mercy Hospital after a fall.  Tr. 723-728.  This had resulted in back pain, which he rated as an 8 on a 10-point scale.  Tr. 723-728.  His back was tender, but his gait and coordination were normal.  His mood and affect were also noted to be within normal limits.  He was prescribed Lorcet Plus and Norco.

The Plaintiff returned to Mercy on March 15-16, 2013, for chest pain.  Tr. 729-739.  X-rays of his lumbar and sacrum were negative, x-rays of his chest revealed only post surgical findings, and an EKG showed normal sinus rhythm with no signs of ischemia.  The Plaintiff was given Dilaudid and Zofran injections in ER.  Doctors diagnosed chest pain and prescribed Norco, Percocet, and Phenergan.  They also noted a normal affect and mood.

On August 2, 2013, Plaintiff was seen at Mercy Hospital for recurrent chest pressure to the center of his chest radiating into his left arm, which he rated as a 7 on a 10-point scale.  Tr. 11-21.  He denied nausea, vomiting, and syncope.  Although the Plaintiff reported daily chest pain, he

---

[1] The nursing staff noted that the Plaintiff asked for a variety of pain medications and Benzos, as well as Phenergan to treat a variety of symptoms.  Tr. 706.  He also asked the ER doctor for prescriptions for pain medication and Benzos until he could see his primary care doctor, but said requests were refused.  Tr. 706.

informed the medical personnel that he had not been taking his chronic pain medications. However, he did report taking approximately eight Nitroglycerine tablets daily, receiving only temporary relief with the recurrence of symptoms.  Physical and mental exams were unremarkable. Further, a chest x-ray was within normal limits.  Doctors prescribed Imdur for continuous chest pain relief.  They also administered a shot of narcotics for back pain prior to discharge.  His final diagnoses were coronary artery disease status triple coronary artery bypass grafting, chronic low back pain, and chronic chest pain.  Tr. 12-21.

On August 3, 2013, Plaintiff returned to the Mercy ER for complaints of a headache with associated nausea.  Tr. 22-25.  Both mental and physical exams were normal.  And, a CT scan of his brain revealed no acute abnormality.

No further treatment was sought until November 29, 2013, at which time he was treated in the Sparks ER for low back, neck, and right shoulder pain after falling down the steps.  Tr. 121-146.  An exam revealed a decreased range of motion in the lumbar spine, bilateral tenderness in the lumbar spine, tenderness to palpation of the shoulder joint with a full active range of motion, and an antalgic gait.  Tr. 124-146. X-rays of his lumbar spine were negative.  Doctors prescribed Tylenol # 3, Meloxicam, and Flexeril for a diagnosis of back sprain/strain.  He was also instructed with regard to back exercises.

On January 2, 2014, Plaintiff again went to the ER at Mercy with complaints of chest pain. Tr. 26-40.  He indicated that the pain was intermittent, having begun the previous evening.  As with previous work-ups, chest x-rays and an EKG were normal.   Although admitted for observation, he left against medical advice after approximately six hours.   He returned the following day, very apologetic and desiring treatment for continued chest pain.  Tr. 41-60.  The Plaintiff had taken multiple Nitroglycerine tablets to no avail.  Doctors readmitted him for further

evaluation of acute coronary ischemia.  A physical exam was normal, cardiac enzymes were negative, and an echocardiogram revealed an ejection fraction rate of 62 percent, left ventricular hypertrophy with preserved systolic function, no significant ventricular abnormalities, and a normal pericardium.  Doctors ruled out the possibility of a myocardial infarction.  They gave him the option of going home and arranging for an outpatient work-up, and he chose this option.  Accordingly, medication adjustment were made and he was released with prescriptions for Xanax, Metoprolol, Amlodipine, Nitroglycerin, Percocet, Protonix, Lisinopril, and Lipitor to treat chest pain; hypertension; and anxiety disorder.  Again, doctors stressed the importance of establishing with a primary care physician instead of seeking intermittent emergency room treatment and directed him to quit smoking.

Plaintiff returned on January 5, 2014, for severe recurrent chest pain radiating into his back. Tr. 61-82.  His reported symptoms included diaphoresis, near-syncope, and weakness.  And, he reported increased chest pain despite receiving both Nitroglycerine and intravenous Dilaudid.  Tr. 61-82.  Again, doctors admitted him to telemetry for continuous monitoring with serial cardiac enzymes and EKGs.  They were able to definitively rule out acute coronary ischemia.  The Plaintiff reported that he had been receiving Percocet through the pain clinic, but due to the expense, he was no longer seeing a pain specialist.  He was reportedly getting his pain medication from his girlfriend.  An examination revealed tenderness to palpation of the chest wall, but was otherwise normal.  The doctor opined that his symptoms did not appear to be angina.  The Plaintiff was released the following day with final diagnoses of chest pain, unspecified; stable coronary artery disease; and, tobacco use disorder.

On January 8, 2014, Dr. Ngoc Van Hoang treated the Plaintiff for back pain and angina. Tr. 9.  A physical exam revealed a full range of motion in the joints, extremities, back, and neck.

His gait was within normal limits and his back nontender.  Dr. Hoang diagnosed him with back pain, angina, coronary artery disease/coronary heart disease, and anxiety disorder.  He prescribed Norflex, Alprazolam, and Percocet.  Tr. 9.

On January 9, 2014, Plaintiff sought emergency treatment at Sparks for chest pain.  Tr. 147-166.  He indicated that the pain began after exerting himself in an attempt to move a vehicle stuck in the ice.  Although doctors planned to admit him, he left against medical advice and refused a heart catheterization.

On January 22, 2014, Plaintiff returned to Dr. Van Hoang for treatment of his sinuses.  Tr. 10.  Following an unremarkable physical exam, Dr. Hoang assessed the Plaintiff with angina, low back pain, and a herniated lumbar disc.  He prescribed Percocet.

Plaintiff was admitted to Mercy Hospital on January 28, 2014, for chest pain that began after he carried firewood.  Tr. 83-108.  He claimed to have stopped breathing when the paramedics arrived, but said "they got me back breathing."  His chest pain began several hours earlier when he was carrying firewood.  Symptoms included syncope, shortness of breath, nausea, vomiting, and dizziness.  The Plaintiff became upset when the doctor refused to give him narcotics to treat his headache and chest pain.  However, he vowed not to leave, indicating he would have a heart catheterization if it "killed him."  An EKG and serial enzymes showed no acute abnormality.  Heart catheterization, as compared to the previous study of March 2012, showed further atrophy and decreased flow down the left internal mammary artery graft; a totally occluded left circumflex, and similar left ventricular function.  Doctors recommended that the Plaintiff be considered for medical therapy and aggressive risk factor management.  His discharge diagnoses included noncardiac chest pain, chest wall pain, coronary artery disease, chemical dependency with nicotine, hypertension, and gastroesophageal reflux.  Again, doctors did not feel the Plaintiff's

13

pain was cardiac in nature, rather they felt it to be musculoskeletal.  He was counseled regarding pain medication and activities that might exacerbate his symptoms including lifting, pulling, and straining.  The Plaintiff was discharged on January 30, 3012, with prescriptions for Aspirin, Oxycodone, Xanax, Atorvastatin, Lisinopril, Metoprolol, Amlodipine, Protonix, Imipramine, and Nitroglycerin.

On January 31, 2014, Plaintiff returned to Dr. Van Hoang's office for medication refills. Tr. 11.  Following an unremarkable exam, he diagnosed the Plaintiff with back pain, angina, coronary artery disease/coronary heart disease, and anxiety disorder.  Dr. Hoang prescribed Diazepam and Percocet.

On February 3, 2014, Plaintiff was seen at Mercy Hospital with groin pain at the site of his heart catheterization the previous week.  Tr. 109-113.  Again, he was walking down stairs and carrying firewood when the pain began.  An examination revealed some musculoskeletal tenderness, but a venous doppler showed no evidence of deep vein thrombosis involving right lower extremity, a pseudoaneurysm, or an arteriovenous fistula in the right groin.  Further, an EKG showed a normal sinus rhythm.

On February 22, 2014, Plaintiff returned to the Mercy emergency department with chest pain that was not responsive to Nitroglycerine.  Tr. 114-123.  He told the doctors that he was previously advised to return to the emergency room if his chest pain returned, and "if he was not having a heart attack he could get a pain shot and go home."  The Plaintiff was diagnosed with coronary artery disease with blockage in the small vessels.  Doctors recommended conservative treatment to include Aspirin and Nitroglycerin.

14

IV.   **Discussion**:

The Plaintiff raises the following issues on appeal:  1) whether the ALJ failed to fully and fairly develop the record; 2) whether the ALJ conducted a proper credibility analysis; and 3) whether the ALJ's RFC assessment is supported by substantial evidence.  The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs and the ALJ's opinion, and are repeated here only to the extent necessary.

We have reordered the Plaintiff's arguments for clarity.

A.   **Duty to Develop the Record**:

The Plaintiff contends that the ALJ erred by failing to develop the record.  It is true that the ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts.  *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record.  *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).  While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."  *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).  Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.  *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001).  A claimant must show that the ALJ's further development of the record would have made a difference in his case or could have changed the outcome.  *Onstead v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

The Plaintiff makes two arguments concerning the ALJ's duty to develop the record. First, he contends the ALJ should have ordered a cardiology or orthopedic consultative examination prior to rendering his opinion. However, after reviewing the record, we disagree. The record contains approximately 600 pages of medical records documenting the Plaintiff's treatment, primarily in emergency rooms, for chronic chest and lower back pain. Although the Plaintiff failed to follow-up with his cardiologist after undergoing triple coronary artery bypass surgery, cardiologists in the emergency room evaluated and treated the Plaintiff during the relevant time period. Doctors repeatedly opined that the Plaintiff's chest pain was not cardiac in nature, with testing revealing no evidence of ischemia. In fact, in 2012, cardiologist Dr. Timothy Waack concluded the Plaintiff had a "well revascularized" system and was in need of no intervention. Tr. 179-180, 516.

Similarly, Plaintiff's low back pain does not warrant remand for a consultative orthopedic examination. The objective evidence has revealed nothing more than straightening of the lumbar spine with some minimal degenerative endplate changes. Tr. 180, 568. Physical exams occasionally revealed tenderness or a limited range of motion, but were most often unremarkable. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). Although he did receive short-term narcotic pain medication and muscle relaxers in the emergency room, we note that the Plaintiff failed to seek out treatment from a primary care physician or a pain specialist, as emergency room doctors repeatedly advised him. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (a failure to follow a recommended course of treatment weighs against credibility). And, sadly, it appears that the Plaintiff developed a dependency on these medications, cursing the doctors or leaving the emergency room when they refused his requests for narcotics. Tr. 180, 484. *See Anderson v.*

16

*Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) (ALJ may consider a claimant's misuse of narcotic medications and attempts to manipulate medical providers into prescribing narcotic medication).

We also note that the Plaintiff frequently sought out treatment for back pain following strenuous activities such as lifting heavy furniture and carpet rolls, remodeling his home, and carrying firewood.  His ability to perform these tasks, despite his alleged ongoing back pain, suggests he is much more capable of performing work-related activities than he has alleged in his applications.  Accordingly, after reviewing the entire record in this case, we can find no error in the ALJ's failure to order consultative orthopedic or cardiology examinations.

The Plaintiff also takes issue with the ALJ's failure to consult a medical expert regarding the application of Listing 4.04.  He asserts that a coronary angiogram showed 50 percent stenosis, 70 percent stenosis, and 80 percent stenosis causing him to meet the threshold requirements of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04C(1).  However, part two of this listing also requires that stenosis result in very serious limitations in the Plaintiff's ability to independently initiate, sustain, or complete activities of daily living.  *Id*. § 4.04C(2).  And, as previously noted, Dr. Waack opined that the Plaintiff had a "well revascularized" system and was in need of no intervention.  In fact, repeated testing proved the Plaintiff's pain to be non-cardiac in nature and the doctors were able to definitively rule out a myocardial infarction.

Further, we cannot say his recurrent chest pain has been unresponsive to treatment.  To the contrary, his chest pain responded well to emergency room treatment each time, with the Plaintiff experiencing improvement and being discharged in stable condition.  *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  Accordingly, we find no error in the ALJ's failure to consult a medical expert.

B.    **Credibility Analysis:**

The Plaintiff also contests the ALJ's credibility assessment.  An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and, (5) functional restrictions.   *See id.*   The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the Plaintiff's complaints.  *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir. 2004).  However, the ALJ need not explicitly discuss each *Polaski* factor.  *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir. 2004).  The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.  *Id.*  Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

However, the standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents him from performing any kind of work).  A mere diagnosis alone is insufficient to establish disability.  *Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014) (merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing).

The ALJ discredited the Plaintiff for the following reasons:  1) the objective evidence does not support the Plaintiff's subjective reports of limitation; 2) the Plaintiff's failure to follow medical advice by following-up with a cardiologist and establishing care with a primary care physician or pain specialist; 3) the Plaintiff's failure to take the medications as prescribed, 4) the Plaintiff's inconsistent statements regarding his work history, ability to prepare meals, and drug use; 5) the Plaintiff's ability to return to work two weeks after bypass surgery (by his own admission); 6) the amenability of the Plaintiff's condition to treatment and its responsiveness to the conservative modalities employed by medical professionals; 7) the Plaintiff's reported ability to care for his personal hygiene, prepare meals, perform general household chores, visit with friends and family, drive a vehicle, manage his finances, use a riding lawn mower weekly or bi-weekly, lift furniture and carpet, carry firewood, and remodel his home; and, 8) the Plaintiff's drug seeking behavior.  Tr. 17-182, 320-327, 358-365, 504, 513, 53, 527, 534, 556, 562, 573, 609-611. As such, it is clear to the undersigned that the ALJ properly considered the factors required by *Polaski* and provided good reasons for discrediting the Plaintiff.  As such, his credibility analysis will stand.

Despite the Plaintiff's argument that he failure to follow-up with a cardiologist, seek out treatment from a primary care physician, or consult with a pain specialist as advised by emergency room doctors is excused by his financial inability to pay for treatment, the evidence does not support this assertion.  To the contrary, we note that the Plaintiff has obtained fairly consistent emergency room treatment for each of his complaints.  And, we can find no evidence to suggest that he was ever denied treatment due to his lack of insurance or inability to pay for treatment.  *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (holding that absence of evidence to indicate

Plaintiff was denied treatment due to inability to pay renders Plaintiff's failure to seek out treatment a relevant factor in the ALJ's credibility analysis).

      C.    **RFC Determination:**

The Plaintiff also contends that the ALJ's RFC determination is flawed because it does not contain postural limitations as were imposed by emergency room doctors.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  A disability claimant has the burden of establishing his or her RFC.  *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009)*; see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003); *see also Jones*, 619 F.3d at 971 (RFC finding must be supported by some medical evidence).

The Plaintiff asserts that the RFC should have included limitations regarding bending, repetitive stooping, lifting, pulling, and straining, as advised by emergency room doctors.  Tr. 554-560, 568-575.  After reviewing the records referenced by the Plaintiff, we note they predate the

relevant time period.  However, even when taken into consideration, we can find no indication that the doctors intended to impose permanent restrictions on the Plaintiff.  In fact, the Plaintiff's own behavior suggests otherwise, as it documents him lifting rolls of carpet and heavy furniture, remodeling his home, and carrying firewood.  And, as previously discussed, the objective evidence revealed unremarkable physical exams, non-cardiac chest pain, normal x-rays, and no gait disturbance.  The evidence also suggests that the Plaintiff sought out treatment for alleged pain in order to obtain narcotic pain medication.  *See Anderson*, 344 at 815 (ALJ may consider a claimant's misuse of narcotic medications and attempts to manipulate medical providers into prescribing narcotic medication).  As such, we find the ALJ's RFC determination to be supported by substantial evidence.

The Plaintiff also asserts that the ALJ's RFC assessment is flawed because the record does not contain an RFC assessment from a treating or examining physician.  However, as in the present case, where the ALJ bases his RFC determination on the opinions of non-examining, consulting physicians, the Plaintiff's medical records, and the Plaintiff's reported activities of daily living, an RFC assessment from a treating or examining physician is not required.  *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (the medical evidence, State agency physician opinions, and claimant's own testimony were sufficient to assess residual functional capacity); *Stormo v. Barnhart*, 377 F.3d 801, 807-08 (8th Cir. 2004) (medical evidence, State agency physicians' assessments, and claimant's reported activities of daily living supported residual functional capacity assessment).  For the reasons previously laid out in this section and the sections above, we do not find that an RFC assessment from a treating or examining physician would have changed the outcome of this case.  *See Byes v. Astrue,* 687 F.3d 913, 917–18 (8th Cir. 2012) (to prove an

error was not harmless, Plaintiff must provide some indication that the ALJ would have decided differently if the error had not occurred).  Accordingly, remand for this reason is not appropriate.

Having found substantial evidence supports the ALJ's RFC assessment, we also find the Plaintiff's contention that the ALJ should have applied Medical Vocational Rule 201.14 to be meritless.  The evidence reveals that the Plaintiff is capable of performing light work with the mental limitations assessed.  Because Rule 201.14 applies to cases in which the Plaintiff is limited to sedentary work, it is not applicable to this case.

**IV.**   <u>**Conclusion**</u>:

Having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and the decision is affirmed.  The undersigned further orders that the Plaintiff's Complaint be dismissed with prejudice.

DATED this 3rd day of December, 2015.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE